GIBRALTER COLORADO LIFE COMPANY v. W. W. TAYLOR ET AL.

No. 7218. Decided January 4, 1939.
Rehearing overruled February 1, 1939.
(123 S. W., 2d Series, 318.)

*J. L. Goggans* and *James J. Laney,* both of Dallas, for plaintiffs in error.

The local cashier did not have the authority to waive a default in the payment of an overdue fee or to reinstate a lapsed policy; neither did said cashier waive the default in the payment of the extension fee when she did not accept the check which purported to be for the past due payments uncondition-

ally. Praetorians v. Krusz, 58 S. W. (2d) 27; Sovereign Camp W. O. W. v. Cameron, 41 S. W. (2d) 283; Donaldson v. National Life & Acc. Ins. Co. 53 S. W. (2d) 136.

*Bond & Porter,* of Terrell, for defendants in error.

When defendant has received a check of past due premiums, and deposits same to its general fund, and the cashier testified that it was accepted in settlement of such fees and there is evidence to show that the cashier knew at the time of receiving the check that the insurer was deceased, there is sufficient evidence to support the submission of an issue as to whether defendant company accepted the check in settlement of extension fees due for the months past due. Stetson-Preston Co. v. Dodson, 103 S. W. 685; Kean v. Southwestern Natl. Bank, 50 S. W. (2d) 839; Eyler v. Read, 60 Texas 387; American Natl. Ins. Co. v. Cleveland, 52 S. W. (2d) 327.

Regarding the introduction of evidence as to the genuineness of the signature to letters regarding the extention of premium fees, see 28 Tex. Jur. 401, sec. 10; Western Union v. Sharp, 5 S. W. (2d) 567; National Mut. Ins. Co. v. Davis, 46 S. W. (2d) 351.

*Malone, Lipscomb, White & Seay,* of Dallas, filed argument as amicus curiae.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This suit was instituted by W. W. Taylor, the defendant in error, to recover the amount of a life insurance policy in which his son, Dewey Taylor, now deceased, was insured and the defendant in error, the father of Dewey, was named as the beneficiary. The suit was instituted against the Colorado Life Company but after the case was tried the name of the company was changed to "Gibralter Colorado Life Company." The case was tried before a jury, upon special issues submitted to them; and upon the answers of the jury to said special issues the court rendered judgment for the defendant in error for the amount sued for. The Insurance Company appealed to the Court of Civil Appeals and that court affirmed the judgment of the trial court. 99 S. W. (2d) 1084. The Insurance Company has been granted the writ of error.

The policy in question was issued April 4, 1932. A premium installment, amounting to $50.36, was paid the date the policy issued, and the policy provided that a like amount be paid an-

nually thereafter on April 4th. It also provided, in effect, that in case of default in any annual premium installment when due, and the default should continue for thirty-one days, the policy would lapse. The premium installment which fell due April 4, 1933, was not paid and on April 21st of that year the defendant in error wrote a letter to the Insurance Company asking for an extension of time for the payment of the past due premium. On April 28th T. M. Watlington, who was the Manager of the Renewal Department of the Insurance Company at Denver Colorado, where the home office of the Company was located replied by letter of that date, in which he enclosed a typewritten form of extension agreement and said that when the instrument was received back at the home office; duly signed by Dewey and Mr. Taylor, the time for payment of the past due premium installment would be extended as provided in the said instrument, upon the terms and conditions therein specified. Dewey and Mr. Taylor duly signed the instrument and mailed it to the home office of the Company and same was received there in due time, and the proposed extension agreement was duly effected as of date May 4, 1933. By the terms of said agreement the payment of the past due premium was extended to October 4, 1933, subject to the conditions hereinafter mentioned, among others not presently material. It was provided, in substance, that an extension fee of $2.00 was to be paid to the Company, at its home office, on the 4th day of each succeding month up to and including September 4, 1933. It was further provided, among other things, that in case any such extension fee was not paid when same fell due, twelve days of grace would be allowed, and if at the end of this grace period the extension fee still remained unpaid the extension agreement was to be of no further force or effect, and the policy would lapse. The extension fee which fell due June 4, 1933, was not paid when due or within twelve days thereafter. The extension agreement terminated and the policy lapsed on June 16, 1933. Dewey Taylor was shot and fatally wounded about ten o'clock on the morning of July 10, 1933, in the town of Wills Point, Van Zandt County, Texas, and his parents reached him about an hour afterwards. Dewey died about 8 o'clock that night. Among other special issues submitted to the jury, the trial court submitted the following special issue:

"Question No. 5: Do you find from a preponderance of the evidence that the defendant company, its agents or representatives, in writing agreed that the plaintiff or the insured could have an extension to July 12th, 1933, within which to pay the

extension fee due and owing June 4, 1933?" The jury answered this special issue in the affirmative.

The Insurance Company contends, in effect, that there is no competent evidence of sufficient probative force to raise the fact issue submitted to the jury in the special issue set out above. The defendant in error contends that said fact issue was raised by testimony, hereinafter shown, respecting a certain letter which was received at the Taylor home on July 5, 1933, which letter has been destroyed. The Insurance Company denies writing said letter and disputes its genuineness. It appears that Mr. and Mrs. Taylor, the father and mother of Dewey Taylor, lived on their farm a few miles from the town of Elmo in Kaufman County. A rural mail route leading out of Elmo passed their home. On July 5, 1933, Mr. and Mrs. Taylor, and Mrs. Taylor's sister, Mrs. Clara Welsh, and Mr. R. E. Clemmons, a neighbor, worked in Mr. Taylor's cotton field. Dewey Taylor's two little children were staying at the home of his parents. Dewey was engaged in the business of hauling by truck and was away on a hauling trip. When Mr. and Mrs. Taylor and Mrs. Welsh and Mr. Clemmons came from the cotton field to the Taylor home for lunch that day, a letter, addressed to Dewey, was found in Mr. Taylor's rural mail box. The letter had been delivered by the rural mail carrier that day. Mr. Taylor opened the letter and read it. Each of the other three read it. After lunch all four returned to the cotton field. The letter was left lying on the table in the house. When Mr. and Mrs. Taylor returned from the field late that evening they found that the two little children, who had been left in the house by themselves, had cut up the letter in making paper dolls. That night in cleaning up the litter made by the children, Mrs. Taylor swept up the bits of paper and burnt them in the kitchen stove. All four of the witnesses mentioned above testified that the letter was written on a sheet of letter paper which bore the letterhead of the Colorado Life Company, and that the signature to the letter was in a handwriting which they could not read. Each of said witnesses was shown the letter, heretofore mentioned, which T. M. Watlington wrote on April 28th, in reply to Mr. Taylor's letter of the 21st of that month, and which bears the handwritten signature of Watlington. All of them testified that the signature to said letter was the same as the signature to the letter which they had read at the Taylor home on July 5, 1933. They further testified that the letterhead of the last mentioned letter was the same as that of the other letter. The letterhead of the Watlington letter of April 28th was in printed words as follows: "J. M. Campbell, President.—

Colorado Life Company.— (An Old Line Life Insurance Company.)—Continental Oil Building, Denver, Colorado." All four of said witnesses were permitted, over the objection of counsel for the Insurance Company, to testify that the disputed letter said in substance "We cannot let the policy take care of itself, but will extend to the 12th of July." All of said witnesses testified that this was the substance of all that was said in the letter. Besides the testimony stated above, it further appears from the testimony of Mr. and Mrs. Taylor, that prior to July 5, 1933, Mrs. Taylor, at the request of Mr. Taylor, wrote a letter to the Insurance Company, and signed his name thereto, and that same was at once mailed to the Insurance Company at Denver. This letter, omitting the signature, reads as follows:

"Elmo, Texas, R. 1, July 3rd. "Dear Sirs: I dont feel like the policy is lapsed, for my agent told me if I kept it paid for one year or more, and then got in a place where I couldn't meet the premium payments that there would be enough dividen he thought to pay for month or 2 Well I got in a place where I couldent get hold of any money for awhile so I thought you would take care of it for me that way for a little while. I dont want the policy to lapse. I like it and dont mean to drop it especially in a time like this. I certinly will appreciate it if you will help me out in a trying time like this. I will pay for July and August just as soon as I can get the money and I wish you people would please help me out on the past premium useing the dividen as I thought you could My son is still in good health every way. I hope you will look after this for me. I will sure thank you all you do for me, as I am very buisy."

Mr. Taylor testified that this letter was misdated; that same was really written and mailed on or about June 18, 1933. The envelope in which this letter was mailed is in the statement of facts. The Elmo postmark thereon indicates that the letter was mailed July 5, 1933. It appears that the letter was received by the Insurance Company, at its home office in Denver, on July 7, 1933.

It is seen from the foregoing statement of the testimony that the finding of the jury in answer to the special issue herein above set out depends entirely on the genuineness of the letter which was destroyed as stated. It therefore becomes necessary to decide whether or not the foregoing testimony has sufficient probative force to raise the fact issue that said letter was genuine.

■ Where the genuineness of a letter is the subject of inquiry, common experience tells us that the signature to the letter is predominant. This is so for the reason that by signing the letter, the author adopts as his own the language used in the body of the letter, regardless of whether such language be printed, typewritten or written by hand. Holding this in mind, we proceed now to consider the legal force of the testimony of the four witnesses, hereinabove mentioned, to the effect that the signature to the letter which they read July 5, 1933, was the same as the signature to the Watlington letter of date April 28, 1933, which was exhibited to them. At the outset, we are confronted by decisions to the effect that where the genuineness of a document is disputed, the genuineness of the signature to the document cannot be proved by the testimony of a witness to the effect that the signature to the document is the same as an undisputed signature exhibited to him, unless the disputed document, together with the signature thereto, is produced. Mugge v. Adams, 76 Texas 448; Kveton v. Keding, 286 S. W. 673 (writ ref.). See also Collins v. Ball, 82 Texas 259, 17 S. W. 614. Even if we did not have these decisions to guide us, we still would have a statute to guide us. This statute, which became effective May 2, 1933, appears as Article 3737b of Vernon's Civil Statutes, and same reads as follows:

"In the trial of any civil case, it shall be competent to give evidence of handwriting by comparison, made by experts or by the jury. The standard of comparison offered in evidence must be proved to the satisfaction of the judge to be genuine before allowing same to be compared with the handwriting in dispute."

■ By plain implication, the provisions of this statute render incompetent the testimony of any witness, whether he be an expert or not, to prove by comparison the genuineness of the signature to the disputed document, unless said document, together with the signature thereto, is produced before the jury for comparison. The statute does not, either expressly or impliedly, exclude from the operation of its terms a document which has been lost or destroyed. The loss of the document simply affords a legal basis for secondary evidence. The loss does not dispense with the necessity to prove, by legally competent means, the fact that the document was genuine. 2 Wigmore on Evidence (2nd Ed.) Section 1188. If this were not true, it would necessarily follow that a lost document would occupy a more favorable attitude in this respect than if the document were produced. The testimony of Mrs. Taylor and

the other witnesses to the effect that the signature to the destroyed letter was the same as the signature to the Watlington letter is, after all, but the expression of the opinion of the respective witnesses, based on the comparison of a signature which was not produced before the jury. This testimony is clearly incompetent to show either that Watlington signed the letter which was destroyed, or that said letter purported to be signed by him. In either case the result is reached by comparison of handwriting. It is true that under what we shall term the "reply letter doctrine," which is exemplified in the case of Ullman, Lewis & Co. v. Babcock, 63 Texas 68, the genuineness of the signature to a "reply letter" may be shown, prima facie, by circumstantial evidence; but an indispensable circumstance in making such showing is the fact that the "reply letter" *purports to be signed* by the person who is sought to be proved the author of the letter. In the present case, this indispensable circumstance does not appear. None of the witnesses mentioned were able to say that the lost letter purported to be signed by Watlington. They admitted that they were unable to read the handwriting in which the signature to said letter was written. Enough has been said by us to show that there is no evidence of sufficient probative force to raise the fact issue which the trial court submitted to the jury in the special issue hereinabove set out.

■ It is further claimed by the defendant in error that a waiver by the Insurance Company of the forfeiture which occurred on June 16, 1933, is shown by testimony now to be stated. Mr. Taylor testified that on July 7, 1933, he had a check for $4.00 written for him by the assistant cashier of the bank at Wills Point, Texas, where he carried a deposit account. The check was made payable to the Insurance Company, was signed by Mr. Taylor, enclosed in an envelope, addressed to the branch office of the Company at Dallas, Texas, and was left with the assistant cashier to mail. The following notation was written on said check by the assistant cashier, at the direction of Mr. Taylor: "June and July payment on policy No. 34205—Dewey Taylor." The post mark on the envelope in which this check was enclosed indicates that the same was mailed at Wills Point on July 10th, the day Dewey was shot. The testimony shows and the jury found that the envelope containing the check was received by the Company, at its branch office at Dallas, on July 11, 1933. The cashier for the Company at Dallas, upon receiving the check, deposited same to the credit of the Company in a bank there and the check was forwarded for collection and was paid. We shall take for granted that the cashier

knew at the time that Dewey, the insured, was dead, and that the cashier had authority from the Insurance Company to accept payment of the extension fees as she did, still the acceptance of said fees would not revive the policy, which lapsed before Dewey died. There was no insurance on Dewey's life at the time he died. After he died, there was no subject matter to which the insurance provisions of the lapsed policy could attach. The essential foundation of a life insurance policy is the life of a human being. After the insured dies, the waiver of a forfeiture, which occurred before his death, cannot restore the life insurance contract. See Washington Natl. Ins. Co. v. Craddock, 109 S. W. (2d) 165.

The judgment of the trial court and that of the Court of Civil Appeals are both reversed, and inasmuch as the case was fully developed and there is no reasonable probability of the testimony at another trial being materially different from that contained in the record before us, judgment is here rendered in favor of the plaintiff in error.

Opinion adopted by the Supreme Court January 4, 1939.

Rehearing overruled February 1, 1939.