**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-40351

ALEJANDRA GOMEZ CANTU,

         Plaintiff-Appellant,

versus

JACKSON NATIONAL LIFE INSURANCE COMPANY,
a Michigan Corporation Doing Business in California;
ROMEO CUELLAR, an Individual;
JESSE GUTIERREZ, JR., an Individual,

         Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, GARZA, and CLEMENT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

In a suit brought by Alejandra Cantu seeking proceeds from an insurance policy, the district court entered summary judgment for the defendants. We affirm.

I.

Jose Martinez, a citizen and resident of Mexico, sought to purchase life insurance. He was approached by Jesse Gutierrez, who worked for Romeo Cuellar, who in turn was an agent for Jackson National Life Insurance Company ("JNL"). Martinez eventually submitted applications for two $1 million policies; both named Cantu, his wife, as the beneficiary.

JNL will not issue policies for more than $500,000 to Mexican nationals. It therefore approved Martinez's applications but reduced the amount of the requested benefit. It sent the approved policies to Cuellar (who lives in Texas), along with a cover letter explaining that the policies would not go into effect until Martinez had submitted the first month's premiums and a signed addendum indicating that he accepted the reduction in benefit.

Gutierrez visited Martinez to deliver the approved policies on April 1, 2004. Martinez signed the documents and gave Gutierrez a check to pay the premiums. The check was drawn on a Merrill Lynch cash management account at Bank One in Texas. Because the account had insufficient funds when JNL presented the check for payment, the bank rejected it. On April 15, a week after JNL learned that the check had bounced, it sent letters to Cuellar and Martinez informing them of the nonpayment. Martinez died in an automobile accident the next day, April 16.

Cantu received JNL's letter regarding the bounced check on April 19 and immediately sent a replacement check by overnight delivery. She filed a claim for death benefits a few weeks later. JNL rejected the claim, explaining that the policy had not become effective during Martinez's lifetime.

Cantu sued JNL, Gutierrez, and Cuellar (collectively, "defendants") in

California state court. She primarily alleged that JNL had breached the policies by failing to pay proceeds; she also included various bad faith, misrepresentation, and fraud claims. The case was removed to federal court and transferred to the Southern District of Texas. Cantu then sought to amend her complaint to add claims under Mexican law and Texas state law, including alleged violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act ("DTPA"). The district court granted the request as to the Texas law claims but denied it as to the Mexican law claims, finding that Mexican law was inapplicable. The court then granted summary judgment for the defendants.

## II.

In denying Cantu's motion to assert claims under Mexican law, the court concluded that the Texas choice-of-law clauses in both policies precluded claims under foreign law. Cantu appeals, arguing that, because the policies have no reasonable relationship to Texas, the choice-of-law clauses are unenforceable, and Mexican insurance law should govern the dispute.

### A.

The defendants contend that we do not have jurisdiction to consider the issue, because Cantu's notice of appeal mentions only the order granting summary judgment and does not separately specify the order rejecting the application of Mexican law. That is a technical violation of FED. R. APP. P. 3(c)(1)(B), which requires a notice of appeal to "designate the judgment, order, or part thereof being appealed[.]"

"[A] mistake in designating a judgment appealed from should not bar an

appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced or misled by the mistake." *Turnbull v. United States*, 929 F.2d 173, 177 (5th Cir. 1991). We have inferred an "intent to appeal" where the issue is addressed in the appellant's opening brief. *See, e.g.*, *United States v. Knowles*, 29 F.3d 947, 950 (5th Cir. 1994).

Cantu's opening brief directly indicates her intent to appeal the order rejecting the application of Mexican law. JNL claims that it "would be prejudiced by being forced to address this issue for the very first time at the response stage of appeal," but even had Cantu correctly filed her notice, JNL would be in the same position––appellees always address the issue for the first time at the response stage. Because there is no evidence of prejudice, we have jurisdiction to consider the issue.

## B.

"This Court reviews questions of law, including conflicts of law questions, *de novo*[.]" *Abraham v. State Farm Mut. Auto. Ins. Co.*, 465 F.3d 609, 611 (5th Cir. 2006). As a federal court sitting in diversity, we apply the choice-of-law rules of the forum state. *Canton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990).

The Texas Uniform Commercial Code contains two provisions that plausibly govern this question. The first instructs that "when a transaction bears a reasonable relation to this state . . . the parties may agree that the law . . . of this state . . . shall govern their rights and duties." TEX BUS. & COM. CODE § 1.301(a). When applying that provision, Texas courts look to the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ("the restatement") to determine whether a "reason-

able relation" exists. 1

The second provision states that "[i]f a transaction . . . is a 'qualified transaction,' as defined in Section 271.001, then . . . Chapter 271 governs" a choice of law clause. TEX BUS. & COM. CODE § 1.301(c). Choice of law under chapter 271 is similar to § 1.301 in that both provide that choice-of-law clauses will be enforced where "the transaction bears a reasonable relation to [the chosen] jurisdiction." TEX BUS. & COM. CODE § 271.005(a)(2).[2] Unlike § 1.301, however, chapter 271 is not interpreted with reference to the restatement but instead directly defines the five situations in which a "reasonable relation to a particular jurisdiction" exists:

(1) a party to the transaction is a resident of that jurisdiction;

(2) a party to the transaction has the party's place of business or, if that party has more than one place of business, the party's chief executive office or an office from which the party conducts a substantial part of the negotiations relating to the transaction, in that jurisdiction;

(3) all or part of the subject matter of the transaction is located in that jurisdiction;

(4) a party to the transaction is required to perform in that jurisdic-

---

[1] *See, e.g.*, *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) ("We believe the rule is best formulated in section 187 of the [restatement] and will therefore look to its provisions in our analysis of this case.").

[2] At the time the parties submitted their briefs, the various subsections of chapter 271 discussed here were all located at TEX BUS. & COM. CODE § 35.51. For ease of reference, we use the recent renumbering and non-substantive language changes that became effective April 1, 2009. *See* 2007 Tex. Sess. Law Serv. ch. 885 § 1.01(a) (describing the renumbering as part of a "program [that] contemplates a topic-by-topic revision of the state's general and permanent statute law without substantive change."); *see also* TEX. GOV'T CODE § 323.007(b) ("When revising a statute the council may not alter the sense, meaning, or effect of the statute.").

tion a substantial part of its obligations relating to the transaction, such as delivering payments; or

(5) a substantial part of the negotiations relating to the transaction occurred in that jurisdiction and an agreement relating to the transaction was signed in that jurisdiction by a party to the transaction.

TEX BUS. & COM. CODE § 271.004(b).

The first question, then, is whether the two insurance policies constitute a "qualified transaction." If yes, we decide whether the Texas choice-of-law clauses are enforceable by checking whether one of the five "reasonable relationship" factors supplied by § 271.004(b) is met. If no, our analysis is governed by the restatement.

A "qualified transaction" is one "under which a party . . . is obligated to pay or is entitled to receive[] consideration with an aggregate value of at least $1 million[.]" TEX BUS. & COM. CODE § 271.001(1). Further, § 271.002 states that "two or more substantially similar or related transactions are considered a single transaction if the transactions: (1) are entered into contemporaneously; and (2) have at least one common party."

Cantu argues that the two policies are not "qualified transactions," because each is worth only $500,000. But under a plain reading of the statute, they should be aggregated as a single $1 million transaction––the two policies are substantially similar, they were entered into simultaneously, and the parties to them are identical. As further evidence, Martinez attempted to pay for both policies with a single check.

The next question is whether one of the five "reasonable relationship" factors of § 271.004(b) is met. JNL argues that factor 1 ("a party to the transaction is a resident of that jurisdiction") applies, because Cuellar, one of the agents who

6

negotiated the insurance policies, lives in Texas. Cantu responds that "Cuellar is not a party to the contracts, but only an agent of [JNL] which is a party."

Cantu may be correct that Cuellar, as an agent, is not a party to the final insurance *contract* between JNL and Cantu, but the language of § 271.004(b)(1) requires only that a "party to the *transaction*" be a resident of the jurisdiction. Under the broad definition of transaction––combining substantially similar transactions that were entered into contemporaneously and had at least one common party––Cuellar qualifies as a party. He negotiated with Martinez, co-signed Martinez's insurance applications, and received remuneration from JNL for closing the sale. Accordingly, because one of the § 271.004(b) factors is satisfied, the Texas choice-of-law clause is enforceable, and the district court correctly denied Cantu's motion to assert Mexican law claims.

## III.

The primary issue is whether JNL owes proceeds under the insurance contract. The district court concluded that, because of the bounced check, the required premiums were not paid during Martinez's lifetime. It further determined that, under Texas law, an insurance contract cannot come into effect after the death of the insured, so Cantu's second attempt to pay the premiums could not consummate the agreement.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We review a summary judgment *de novo. Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912 (5th Cir. 1992).

## A.

Cantu argues that JNL caused the check to bounce and so cannot use non-payment of the premium as an excuse to void the contract. On April 1, Gutierrez traveled to Mexico to present Martinez with the final policies and collect payment of the first premium. Cantu contends that when Martinez gave Gutierrez the check, they agreed it would not be cashed until April 8 to give Martinez time to transfer money into the Merrill Lynch account from which the check would draw. Any such promise was broken; Gutierrez sent the check to JNL on April 2, JNL deposited it on April 5, and the bank returned it as "uncollected" for insufficient funds on April 8.

The defendants dispute that an agreement to hold off on cashing the check ever existed, but they point out that even if the check had been cashed on the agreed date, the account would not have contained enough funds. The starting balance of the account was negative $150; Martinez transferred $2000 into the account on April 7; and on April 8, a routine annual fee of $125 was deducted. Thus, on the day Cantu says that JNL agreed to cash the $1885 check, the account contained a still-insufficient $1725.

Cantu responds that had JNL waited until April 8 to cash the check, a Merrill Lynch bank associate would have called Martinez to discuss the shortfall and authorize payment on the check on receiving assurance that Martinez would quickly cover the negative balance. Cantu therefore concludes that failure to

abide by Gutierrez's wait-to-cash-the-check agreement was the "but for" cause of the initial premium's not being paid.

The district court found that Cantu had not produced enough evidence to survive even the low threshold to defeat summary judgment on either argument. It first concluded that "there is no evidence to support a finding that an agreement to delay depositing the first premium check existed between any [JNL] agent and Gonzalez Martinez." It then said that the evidence that Merrill Lynch would have cleared the check after a phone call was "simply too speculative" and did not create an issue of material fact. "At most, the evidence reveals that Merrill Lynch may or may not have exercised its unfettered discretion and contacted Gonzalez Martinez about the shortfall in his account[.]"

Even assuming *arguendo* that there was an agreement to delay deposit,[3]

---

[3] The evidence of any such agreement is thin. Gutierrez says that "there was never a discussion about holding a check—never." Cantu relies entirely on (1) the fact that the check was undated and (2) testimony that Martinez instructed his secretary to "transfer $2,000 [into the bank account] on Wednesday, the 7th" in Gutierrez's presence, and Gutierrez did not object.

To demonstrate an agreement, "there must be shown the element of mutual agreement which . . . is inferred from the circumstances. The conception is that of a meeting of the minds of the parties as implied from and evidenced by their conduct and course of dealing, the essence of which is consent to be bound." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972) (citations omitted). Neither of Cantu's two pieces of evidence is significantly probative of whether Gutierrez consented to be bound by an agreement to delay cashing the check.

Cantu argues that "[i]t is inconceivable that Martinez could have [instructed his secretary to transfer money on April 7] in front of Gutierrez—without eliciting any reaction from him—unless Gutierrez understood that the check was given upon condition that the deposit be delayed." But the Texas Supreme Court, in the context of a dispute over interest charges, stated that "mere failure to object within a reasonable time . . ., without more, could not establish an agreement between the parties[.]" *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 445 (Tex. 1982) (discussing *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enters.*, 625 S.W.2d 295 (Tex. 1981)). In fact, although it was not a summary
(continued...)

9

Cantu cannot demonstrate that her check would not still have bounced.  Her contention that a bank associate would have contacted Martinez and authorized clearing the check is based solely on the following testimony by a bank representative:

> **Q**: If the check had not been presented for collection until the wire transfer had been received, would you have contacted [Martinez] about making up the shortfall before any decision was made to clear the check?
>
> **A**: Merrill Lynch financial advisors and/or client associates have the option to attempt to contact an account holder in regard to a check presented against insufficient funds; however, . . . [they] are under no obligation to do so.  *If the factual scenario set forth in the above question would have occurred, Mr. Martinez's financial advisor or client associate would have likely attempted to contact Mr. Martinez.*
>
> **Q**: If . . . Mr. Martinez said that he would immediately cover the shortfall, did you have the authority to clear the check?
>
> **A**: If Mr. Martinez's financial advisor or client associate had contacted Mr. Martinez . . . and [he] indicated that he would "immediately cover the short fall," the financial advisor would have had the authority to clear the check.  As stated above, although the financial advisor would have had the authority to clear the check, he would have been under no obligation to do so.
>
> **Q**: . . . would have [sic] likely cleared the check?
>
> **A**: As the hypothetical factual scenario set forth in this question did not occur, *Merrill Lynch, at present, is not able to speculate as to whether or not the financial advisor would have agreed to pass the*

---

(...continued)

judgment case, the court added that the failure to object did not "raise a fact question as to the existence or nonexistence of an agreement."  *Id.* at 446.  It is therefore difficult, even under the deferential summary judgment standard, to conclude that Cantu presented evidence of an agreement.

*check at that time.*

(Emphasis added.)

Based on that testimony, and construing the facts in the light most favorable to the plaintiff, there is evidence that the bank likely would have contacted Martinez. Beyond that, however, the bank expressly refused to speculate whether it would have permitted the check to pass. There is thus no evidence indicating that the check would have cleared, so there is no basis on which a jury could conclude that the check bounced because JNL did not wait to present it. We therefore agree with the district court that JNL did not cause the non-payment of the first premium.

## B.

The next question is whether the insurance policies ever took effect despite the first check's bouncing. The district court determined that the only way to accept the offer of insurance and create a binding contract was to pay the initial premium, which did not successfully occur until Cantu sent a replacement check after Martinez's death. The court then concluded that the death extinguished the offer of insurance, so the policies were void by the time Cantu made her payment. Accordingly, Cantu was not entitled to the proceeds, because the policies never took effect.

Cantu urges that the second check was an effective acceptance of the offer of insurance. She relies heavily on the wording of the policies and alleged ambiguities therein.[4] But regardless of the policies' language, the district court

---

[4] As summarized by the district court:

> Plaintiff points to that portion of the application that . . . states that
> (continued...)

accurately recognized that under Texas law, "[t]he essential foundation of a life insurance policy is the life of a human being." *Gibraltar Colo. Life Co. v. Taylor*, 123 S.W.2d 318, 321 (Tex. Comm'n App. 1939).[5] Because Martinez had died by the time the second check arrived, no insurance policy could come into effect.

In her reply brief, Cantu concedes the point. She says that she "has no dispute with the general notion that a post-loss payment will not create a contract," but she contends that the general rule is still "subject to waiver either under equitable principles or pursuant to the doctrine of prevention of performance." Those arguments, however, rely on the already-rejected proposition that JNL caused the first check to bounce.[6] Accordingly, the court did not err in

---

[4] (...continued)

[JNL] must receive the first premium payment within "30" days of the policy's "issue date" in order for the policy to become effective. Plaintiff argues that, because the "3" in "30 days" is not discernable in the best available copy of the application, this term must be construed against [JNL]. Furthermore, Plaintiff argues that . . . the clause itself is ambiguous because the meaning of the term "issue date" is unclear. Plaintiff proposes that the term "issue date" . . . should be interpreted to mean the date the policies were physically "handed to" the insured, which in this case was April 1, 2004. . . . Plaintiff asserts that the second premium check, which was received by [JNL] on April 20, 2004, was received within 30 days of the "issue date" and was therefore sufficient to bring coverage into effect.

[5] A more recent decision, *Allstate Ins. Co. v. Mooney*, 562 S.W.2d 950, 952 (Tex. Civ. App.—Amarillo 1978) (writ ref'd n.r.e.), makes the same point: "At the time of his death, Allstate had no policy of insurance in effect on the life of Kevin Mooney. After he died, there was no subject matter to which the insurance provisions of the terminated policy could attach." *Mooney* also stated that "the death of the insured while the policy is in effect is the one condition under which payment may be enforced. The two facts, death of the insured and life in the policy, must concur, or no liability exists." *Id.* (quoting *Grand Lodge Colored Knights of Pythias v. Preston*, 91 S.W.2d 496, 498 (Tex. Civ. App.—Beaumont 1936) (writ ref'd)).

[6] Cantu cites *Monumental Life Ins. Co. v. Hayes-Jenkins*, 403 F.3d 304 (5th Cir. 2005), as a case in which we allowed an insurance policy to come into existence after the subject of the policy had died. But there, the terms of the policy were so confusing that they might have led the insured to believe that payment of an initial premium was not a necessary predicate

(continued...)

concluding that the contracts never took effect, and therefore Cantu is entitled to none of their benefit.

## IV.

Cantu appeals the dismissal of her various other claims, including fraud, breach of duty of good faith and fair dealing, negligent misrepresentation, and assorted violations of the Texas Insurance Code and the DTPA. Her arguments all rely, however, on JNL's having caused the non-formation of the contract.[7] We have rejected that conclusion, so we affirm the dismissal of those claims.

The summary judgment is AFFIRMED.

---

[6] (...continued)
to obtaining coverage. We therefore reversed summary judgment, holding that the insurance company "might ultimately be found to have waived its right to assert prepayment of the first premium as a condition precedent to coverage." *Id.* at 315. *Monumental* is easily distinguishable from the present case, because here, JNL made plain that it expected to receive a premium before coverage took effect.

[7] During oral argument, Cantu's counsel candidly acknowledged that if (1) we rejected his argument that JNL caused the non-payment and (2) concluded that the second premium check did not create a contract, then "the district court was right, and I ought to lose," and "there is probably no cause under the Deceptive [Trade] Practices Act." He later said, "I take that back" and explained that "[i]f [JNL] would have not been deceptive and taken a check in pesos, which they could have done if they weren't trying to be deceptive and [make] it appear like this was a transaction that occurred in Texas—which it obviously was not—then we wouldn't be here. The check would have been issued in pesos, the coverage would [have] occurred, and the claim should have been and would have been good." But that argument was not made in either of Cantu's briefs.